J-S05016-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO A.M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2059 EDA 2020 |

Appeal from the Decree Entered October 1, 2020
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
No. A2019-0019

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO W.D.L., IV., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2060 EDA 2020 |

Appeal from the Decree Entered October 1, 2020
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
No. A2019-0020

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO: N.N.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2061 EDA 2020 |

Appeal from the Decree Entered October 1, 2020
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
No. A2019-0021

IN RE: INVOLUNTARY TERMINATION   :    IN THE SUPERIOR COURT OF
OF PARENTAL RIGHTS TO: J.A.M., A   :      PENNSYLVANIA
MINOR   :
  :
  :
  :
APPEAL OF: J.C.C., MOTHER   :
  :
  :
  :
  :    No. 2062 EDA 2020

Appeal from the Decree Entered October 1, 2020
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
No. A2019-0022

BEFORE:  BOWES, J., LAZARUS, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, J.:                **FILED APRIL 20, 2021**

J.C.C. (Mother) appeals from the decrees,[1] entered in the Court of Common Pleas of Lehigh County, involuntarily terminating her parental rights to her four minor children, A.M.B. (A., born August 2008), W.D.L., IV. (W., born April 2011), J.A.M. (J., born October 2012), and N.N.M. (N., born November 2013) (collectively, Children).[2]  Upon review, we affirm.

Mother has an extensive history with the Lehigh County Office of Children and Youth Services (CYS).  In August of 2015, CYS caseworker Amanda Scheitrum began working with Mother to remedy her lack of housing. N.T. Termination Hearings, Volume I, 7/29/19 (N.T. Vol. I), at 12-13.  Mother

---

[1] We note that by filing four separate notices of appeal with one docket number on each notice, Mother has complied with the dictates of **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), which held that "where a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each of those cases."  **See also** Pa.R.A.P. 341(a).

[2] Only J. and N. share a biological father, M.M.  None of the children's fathers contests these proceedings.  **See** N.T. Vol. I, at 76-80.

- 2 -

began living with Children at their maternal grandmother's house on Ridge Avenue in Philadelphia until the beginning of 2016 when J., who was three years old at the time, "completely burn[ed the house] down" by playing with a lighter and candle while left unsupervised. N.T. Termination Hearings, Volume II, 7/30/19 (N.T. Vol. II), at 10-12. In April of 2016, CYS received a referral alleging that Mother was suicidal, had substance abuse and severe mental health issues, and was failing to supervise Children at the Super 8 Motel where they lived. Allentown Police Officers investigated the situation, determined it was stable, and did not remove Children from Mother's care. N.T. Vol. I, at 14-15.

By June of 2016, Mother and Children were living with Mother's friend in a home located on 7th Street in Allentown. On June 24, 2016, CYS received another referral stating that Children were left unsupervised while Mother was using drugs. *Id.* at 18-19; *see also* N.T. Vol. II, at 74 (clarifying date as June 24, 2016). Caseworker Scheitrum arrived on the scene and found Children unsupervised in a parking lot behind the home. N.T. Vol. I, at 19. A. informed Caseworker Scheitrum that Mother was sleeping, but when Caseworker Scheitrum knocked on the front door of the home, Mother's friend informed her that Mother was not there. When Allentown Police arrived, Children were seen being scurried into a car that fled. *Id.* at 19; N.T. Vol. II, at 75. Upon entering the 7th Street residence with the police, Caseworker Scheitrum noticed that the "house was filthy. The garbage hadn't been changed for days. There was no food in the fridge, [just] a mound of white[,] powdery substance

on a plate, . . . and empty liquor bottles under the cabinets." N.T. Vol. I, at 19. Mother eventually returned home, and CYS agreed to continue working with her to find housing. *Id.* Mother indicated that she would bring Children to CYS offices the following day for further discussions, but she arrived without them, explaining that they were "at the park." N.T. Vol. II, at 76. For some period of time, CYS did not know Children's whereabouts. *Id.* Days later, however, Mother and Children moved to an apartment in Hamilton Towers in Allentown.[3] N.T. Vol. I, at 20. Mother was unable to provide any medical documentation of recent medical appointments for Children or for her own mental health issues, refused to cooperate with truancy prevention services for A., and admitted to Caseworker Scheitrum that she was not drug-free. *Id.*; N.T. Vol. II, at 76-9.

On July 20, 2016, CYS petitioned for an adjudication of dependency for Children with a disposition that they remain in Mother's care under a protective services order. Following a hearing on August 18, 2016, A., W., and J. were adjudicated dependent on the basis that each child was lacking proper care or control, subsistence, and education as required by law for their physical, mental, or emotional health or morals. N. was adjudicated

---

[3] While living at Hamilton Towers, Mother reported to CYS that Children claimed to have been sexually assaulted by a man named Juan who Mother allowed to supervise them. N.T. Vol. I, at 15-18. Mother failed to follow up on the scheduled forensic interviews. *Id.*

dependent on the same basis following a hearing on October 27, 2016.[4]  As a result of Children being adjudicated dependent, Mother was ordered to:  (1) obtain a mental health evaluation and psychological exam, and follow through with all recommendations; (2) obtain and maintain stable housing and legal income; (3) ensure Children are up to date with medical and dental care; (4) obtain a drug and alcohol evaluation and follow through with all recommendations; (5) attend substance abuse screening at Substance Abuse Screening Services, Inc. (SASSI) twice weekly; (6) ensure school-aged children attend school daily; (7) resolve all outstanding criminal issues; and (8) cooperate with CYS and follow through with all recommendations.  ***See*** Exhibits P1A-1, P1B-1, and P1D-1 (Adjudication Dispositions, 8/25/16); P1C-1 (Adjudication Disposition, 11/7/16).

Despite services being available to her, Mother failed to comply with any of the recommendations in the court's orders.  N.T. Vol. II, at 81-6. Additionally, in January 2017, CYS received a referral that Mother left J. unsupervised with his cousin—who Mother knew had previously broken a family member's arm—who broke J.'s arm.  N.T. Vol. I, at 30.  Accordingly, CYS filed a petition for change of disposition on January 9, 2017, but the trial court continued the hearing for 30 days to determine whether services were

---

[4] N. started living with family in New Jersey in October 2015, when Mother was homeless.  She returned to Mother's home on September 21, 2016.  N.T. Vol. I, at 26-8.

available that could help Mother care for Children without removing them. *Id.* at 31-2; N.T. Vol. II, at 76-9.

On February 2, 2017, CYS learned that Mother went to a prenatal appointment and tested positive for marijuana and cocaine.[5]  N.T. Vol. I, at 31-2.  On February 6, 2017, CYS received a new referral that J. had burned W. while he was, again, left unsupervised with a lighter.  *Id.*  The following day, CYS sought and obtained emergency custody of Children and removed them from Mother's care.  J. was placed in a therapeutic home in East Stroudsburg due to behavioral concerns, while A., W., and N. were placed in a foster home together in Allentown.  *Id.* at 32, 71.  With the exception of N., the children have moved a number of times for various reasons.  *See id.* at 33-4, 71-3; N.T. Vol. II, at 51; N.T. Termination Hearings, Volume III, 9/9/19 (N.T. Vol. III), at 25-6.  Mother was initially granted visitation with Children, but during these visits, Mother instructed Children not to follow their foster parents' rules.  N.T. Vol. I, at 34.

Following a hearing on March 13, 2017, the trial court transferred legal and physical custody of Children to CYS.  Mother was ordered to continue with the court-ordered services described above and was further ordered to cooperate with reunification services provided by Full Circle, follow through with all recommendations, and continue supervised visits with Children, which were contingent upon:  (1) Mother not telling Children to disobey their foster

---

[5] The child was later born stillborn.  N.T. Vol. II, at 108-110.

parents; (2) Mother not disparaging Children's foster parents or any agency working toward reunification; and (3) CYS providing multiple supervisors for each visit to ensure Mother would not negatively influence Children.  **See** Exhibits P2A-1, P2B-1, P2C-1, and P2D-1 (Dispositional Orders, 3/17/17).

After their removal from Mother's care, Children underwent counseling at Pinebrook and received trauma assessments from KidsPeace.  By late October 2017, as their needs became more apparent,[6] each child had transitioned to trauma-informed therapy at Valliere and Counseling Associates (VCA), affiliated with Forensic Treatment Services (FTS), with their own counselor.  N.T. Vol. I, at 60-3; N.T. Vol. II, at 51-4.  In therapy, Children started disclosing the extent of the abuse and mistreatment they suffered at the hands of Mother and her associates.

Children reported to their individual therapists that Mother was generally mean and violent.  A. described being strangled to the point of losing consciousness on one occasion.  N.T. Termination Hearings, Volume IV, 9/10/19 (N.T. Vol. IV), at 83.  Each child explained that, in addition to using her hands and fists, Mother frequently hit Children with electrical cords, belts, shoes, and a wooden paddle with a nail at the end.  N.T. Vol. I, at 107; N.T. Vol. IV, at 52; N.T. Termination Hearings, Volume V, 9/30/19 (N.T. Vol. V), at

---

[6] Children frequently acted out and exhibited negative behaviors, including significant defiance.  J. exhibited physically and sexually aggressive behavior towards W., who would retaliate against J. and target N. in a similar manner. N. experienced significant bedwetting issues.  A. also had issues with urinating herself, would get into fights at school, and was verbally aggressive with adults and peers.  **See** N.T. Vol. II, at 107.

54, 131, 147. Mother hit Children on areas of the body where marks would not be apparent, such as their legs. N.T. Vol. I, at 107; N.T. Vol. V, at 92. A. testified that Mother engaged in physical fights with Children wherein Mother and Children would hit each other "back and forth all the time." N.T. Vol. V, at 92. Mother also directed her paramour, Ted Hansley, to beat Children when she "didn't feel like [doing it]." N.T. Vol. IV, at 121, 142. In addition, Mother instructed Children to physically fight each other to solve problems between themselves. *Id.* at 121.[7]

Mother's household had pervasive issues with sexual boundaries as well.[8] Mother engaged in sex in front of Children, allowed Children to watch pornography, and showed Children images on her cell phone of herself having sex. N.T. Vol. I, at 107; N.T. Vol. IV, at 52, 83; N.T. Vol. V, at 94.[9] Mother

---

[7] N. testified that Mother also "shot a person" in their home and "killed [their] dog." N.T. Vol. V, at 149.

[8] *See, e.g.*, n.6, *supra*.

[9] Doctor Bradley Beckwith testified that:

> [W]hen [someone] start[s] to show [a child] that [the penis, vagina, and anus] can be used for other things [besides urinating and defecating], such as sexual pleasure or just sex in general, it creates quite a few issues with the child. . . . My concern is when someone knowingly exposes a child to pornography or has sexual intercourse with somebody else in front of them, what they're doing is . . . potentially grooming that child to have sex be normalized within the household. So, this is something—and I have a lot of experience in working with sex offenders, that a lot of sex offenders have done in their past to eventually assault these children. . . . I have a lot of concerns that this is a serious

would also "touch [J.'s] penis and make him feel weird[,] and [] W[.] was there when she would do that." N.T. Vol. IV, at 147. A., W., and J. revealed that two of Mother's paramours, Ted Hansley and M.M.—J. and N.'s father— as well as a third acquaintance named Juan, had sexually abused some of the children by kissing them, touching them, or forcing them to perform oral sex. *See* N.T. Vol. I, at 15-18, 87; N.T. Vol. IV, at 121, 142; N.T. Vol. V, at 58. Mother insisted Children were lying. N.T. Vol. III, at 56; N.T. Vol. V, at 7, 58.

Moreover, Children explained that Mother was neglectful, often leaving A. to supervise her siblings, and that Mother endangered and mistreated them in various other ways. N.T. Vol. IV, at 121. Mother smoked marijuana (as well as cigarettes) in the house "almost every day," whether alone or with friends, in front of or in the same room as Children. N.T. Vol. V, at 92-4. Ted Hansley gave Children alcohol at night to put them to sleep. N.T. Vol. I, at 108. Often times, Mother's household lacked running water, a bathroom, and even food. N.T. Vol. IV, at 83. A. testified that Children "would basically have to starve." N.T. Vol. V, at 104. Additionally, Mother failed to ensure Children received medical and dental care or attended school. N.T. Vol. IV, at 83.

---

grooming behavior for potential sexual abuse. Particularly, considering [Mother] told me that she was previously in relationships with three sex offenders.

N.T. Vol. V, at 65-66.

Ultimately, each of Children's therapists recommended suspension of visits, and CYS petitioned the court to suspend all visitation. On December 22, 2017, the court suspended all visitation between Mother and A.,[10] reduced Mother's visitation with the other three children to once a month, and ordered Mother to participate in a violent offender evaluation, lest she lose her remaining visitation rights. N.T. Vol. I, at 60-67; Exhibits P3A, P3B, P3C, P3D (Orders, 12/22/17). In a report dated January 18, 2018, Doctor Bradley Beckwith concluded that Mother poses a danger to any child in her care, based on the information he gleaned from Mother's violent offender evaluation. N.T. Vol. V, at 69. Doctor Beckwith recommended that Mother have no contact with Children, that she receive violent offender treatment, and that all visits between Mother and Children be suspended until she showed progress in violent offender treatment and could appreciate the impact she has on her children. N.T. Vol. I, at 67-68; N.T. Vol. II, at 106; N.T. Vol. V, at 25-27. He explained that Mother "has a very significant history of violence, and until that is treated, her fitness as a parent is significantly impacted to the point where she poses a risk to [Children]." N.T. Vol. V, at 26. Prolonged violent offender treatment was "absolutely vital for [Mother] to parent her child in any capacity." *Id.*

In April of 2018, following a hearing, the court suspended visitation between Mother and W., J., and N. based on Mother's noncompliance with

_____

[10] A. was hospitalized twice for suicidal ideation related to Mother's visits. N.T. Vol. IV, at 86-7.

court-ordered services and failure to demonstrate sobriety. *See* Exhibits P4B-41, P4C-37, P4D-41 (Orders, 4/11/18). On May 4, 2018, Mother was discharged from violent offender treatment at FTS for failing to attend. Mother reengaged in violent offender treatment in March of 2019, but was discharged in June of 2019 for failing to reschedule the sessions she canceled. Mother did not respond to FTS' attempts to reschedule, nor did she follow up with CYS' subsequent referral for her to receive violent offender treatment at PA Forensic Services. N.T. Vol. I, at 67-71; N.T. Vol. III, at 13-19. Although Mother attended visitation when it was available to her, due to her lack of progress with violent offender treatment, Mother has not visited A. since December of 2017, and has not visited N., W., or J. since April of 2018. N.T. Vol. I, at 59-60; N.T. Vol. II, at 96.

On April 1, 2019, two years after taking custody of Children, CYS filed petitions to terminate Mother's parental rights based on her lack of housing, her "recidivism rate with going [in and out of] jail,"[11] and her failure to

---

[11] Mother was arrested on July 13, 2017 for theft of a prescription pad, and she was ultimately sentenced to time served to 23 months' imprisonment followed by 12 months' probation or parole. By November 29, 2017, Mother was released from prison, but by December 10, 2017, Mother violated parole and had to serve the balance of her sentence. N.T. Vol. II, at 96-100. Mother was incarcerated again in April of 2018 due to an altercation at Lehigh Valley Hospital, but was released the same month. *Id.* At that time, Mother had outstanding warrants in Luzerne County and in Philadelphia County for other criminal matters. *Id.* at 101. Following her release in April 2018, Mother's whereabouts were unknown to CYS until she was reincarcerated in Lehigh County in October of 2018. *Id.* at 102. Mother was placed on work release on March 7, 2019, and was paroled on April 29, 2019. N.T. Vol. III, at 41.

complete the violent offender treatment that was a prerequisite for her to resume visiting Children.  N.T. Vol. III, at 14-15.  The trial court held hearings on the matter on July 29, 2019; July 30, 2019; September 9, 2019; September 10, 2019; September 30, 2019; and January 21, 2020,[12] at which the following individuals testified:  CYS Caseworker Scheitrum, who worked with the family from August of 2015 to October of 2018; CYS Caseworker Cody Groller, who worked with the family from October 2018 to August 2019; CYS Caseworker Rose Trumbore, who assisted in removing Children from Mother's care; Kenia Blanco, permanency specialist at Justice Works Youth Care (JWYC) who worked with Children; Jocelyn Rios, family and permanency specialist at JWYC who worked with Children; Dr. Bradley Beckwith, licensed psychologist and licensed professional counselor at VCA who evaluated Mother; Dr. Aaron Meyers, licensed psychologist at VCA and FTS who worked

_____

[12] Attorney Michael E. Moyer, Esquire, Children's guardian *ad litem*, represented Children throughout the proceedings.  **See** N.T. Vol. II, at 91-3 (court clarifying for the record that "Attorney Moyer is the court-appointed guardian *ad litem* in the dependency proceedings for [Children]. . . . [T]here does not appear to be any conflict of interest between each of the minor[s'] best interests and their legal interests.  If Attorney Moyer is aware of or becomes aware of any such conflict, he shall immediately notify the Orphans' Court.").  **See** 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 200 A.3d 969 (Pa. Super. 2018) (en banc), **but see In Re: T.S., E.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

with Mother; Trista Dashner, A.'s therapist at VCA; Brandon Becker, W.'s forensic counselor at VCA; Jenn Rau, J.'s therapist at VCA; Abraxas case manager Paula Azar, who provided reunification services to Mother; and Children, each individually, *in camera* in the Honorable Melissa T. Pavlack's chambers.

On October 1, 2020, Judge Pavlack entered final decrees terminating Mother's parental rights to Children pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[13]  Mother timely filed the instant appeal, raising the following issues for our review:

> 1.  Did the trial court commit an error of law or abuse of discretion in its determination that [CYS] sustained its burden of proof by clear and convincing evidence that the statutory standards set forth in 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8) had been met?
>
> 2.  Did the trial court commit an error of law or abuse of discretion in its determination that [CYS] sustained its burden of proof by clear and convincing evidence that termination of parental rights best meets the developmental, physical[,] and emotional needs and welfare of the child as required by 23 Pa.C.S.A. § 2511(b)?

Brief of Appellant, at 4.

Our standard of review in cases involving the termination of parental rights is well-settled:

> [It] requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

---

[13] 23 Pa.C.S.A. §§ 2101-2938.

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision [] should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a two-step analysis. First, the party seeking termination must prove by clear and convincing evidence that the parent's conduct meets at least one of the grounds for termination set forth in section 2511(a). *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). These grounds, as asserted in CYS' termination petitions, include, *inter alia*:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to

- 14 -

the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8). This determination requires evidence "so clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1191, 1201 (Pa. Super. 2000) (en banc). If and only if grounds for termination are established under subsection (a) does a court then determine whether termination would be in the best interest of the child, considering his or her developmental, physical, and emotional needs and welfare, pursuant to subsection (b). *See In re Adoption of S.P.*, 47 A.3d 817, 827-30 (Pa. 2012).

Upon our review, we find that, at the termination hearings, CYS proved by clear and convincing evidence that the statutory grounds for termination under section 2511(a)(2) were met. CYS obtained custody of Children in 2017 because of Mother's mental health issues, substance abuse issues, and inadequate supervision of Children.

> After [Children] were in [CYS] custody, it became clear that Mother's repeated abuse and neglect . . . deprived [Children] of essential parental care, control, or subsistence necessary for their

- 15 -

well-being long before [CYS] removed [Children] from her care. [Mother] failed to protect [Children] from her paramours and other associates, resulting in numerous instances of sexual and physical abuse. She personally inflicted physical abuse on them by lashing them with cords, belts, and a wooden board with a nail on the end; she strangled her eldest daughter [un]till she lost consciousness. Mother even exposed the youngest of the children to pornography and showed them pictures of herself having sex. She deprived them of adequate supervision, food, medical and dental care, and consistent school attendance. Inadequate supervision led to one of the children burning a house down and burning his brother in separate incidents, and to the same child having his arm broken by a cousin, ostensibly on purpose, despite Mother's knowledge that the cousin had previously intentionally broken another family member's arm. In short, while in Mother's custody, [Children] were endlessly subjected to many types of trauma due to Mother's abuse and neglect.

Since December 22, 2017, Mother has been required to cooperate with the recommendations of a violent offender evaluation. This evaluation revealed that Mother feels a sense of entitlement: [s]he believes she is entitled to treat her children as she sees fit. She also demonstrated a lack of empathy and accountability for what she put her children through. She was unable to recognize or accept that her treatment of them was abusive or neglectful; in her mind, she was a great parent, her children were liars, and it was always someone else's fault.

The recommendation from the evaluation included prolonged treatment in individual and group violent offender therapy. Her cooperation would have been the linchpin to any success Mother could have made toward reunification with [Children]. She was given numerous opportunities to participate in treatment, but she neither completed treatment nor even demonstrated a commitment to regular attendance. She engaged in just 12 individual therapy sessions at FTS over the course of a little more than a year and was discharged from therapy twice. Mother did not offer any justification for her failure or refusal to comply with this essential service. Because Mother never fully addressed her violence issues, she remains a high risk to children, including her own. Reunification is not presently feasible as there is no reason to believe the children would be safe in Mother's care.

The feasibility of reunification in the future is slim to none. Even

> if Mother were to reengage in treatment, Dr. Beckwith explained the necessary treatment period would have to be a prolonged period before Mother could safely parent any of her children[, n]o doubt in part because of her entrenched perspective of her own blamelessness, her prognosis in treatment is very poor. [Dr. Beckwith] indicated that even if [Mother] were to take accountability for her abusive acts toward [Children], she would need a minimum of six months to a year of consistent treatment until she could start to have visitation with [Children]. Mother's therapist at FTS indicated, after trying to work with her both times she engaged in therapy, that she would likely need consistent violent offender therapy in excess of a year, possibly two, to adequately address her issues.

Adjudication, 10/1/20, at 15-20 (internal citations omitted).

We agree with the trial court that, in light of the compelling testimony offered at the termination hearings, Mother's history of non-compliance with court-ordered services—including failure to maintain stable housing, failure to remain drug-free, and failure to commit to mental health treatment—her unsuccessful discharges from violent offender treatment, and the amount of time that has passed in which Mother failed to complete violent offender treatment, it is clear that Mother's "repeated and continued incapacity, abuse, neglect[,] or refusal" to cooperate with court-ordered services has caused Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being, and that Mother cannot or will not remedy the situation within a reasonable period of time, if at all. *Id.*

at 20.[14]  Accordingly, we find that the record supports the trial court's ruling that termination was proper pursuant to section 2511(a)(2).[15]

Turning to the analysis under section 2511(b), we note that, in terminating the rights of a parent, the court shall give primary consideration to the developmental, physical, and emotional needs and welfare of the child. 23 Pa.C.S.A. § 2511(b).  "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *In re K.S.Z.*, 948 A.2d 753, 760 (Pa. Super. 2008).  The extent of any bond analysis depends on the circumstances of the particular case.  *Id.* at 763.  "In cases where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists." *Id.*  Moreover, the mere existence of an emotional bond does not preclude termination of

---

[14] Mother argues that "[her] imprisonment should not be the sole basis for . . . determining whether or not to terminate [her] parental rights to [Children]." Brief of Appellant, at 13.  We are satisfied from our review of the record that the trial court did not consider Mother's imprisonment as the sole basis, or even the primary basis, for terminating her parental rights to Children.  *See* Adjudication, 10/1/20, at 14-21.  Rather, the court placed appropriate emphasis on Mother's persistent failure to complete violent offender treatment, which she knew was a prerequisite to resuming visitation with Children, as well as her failure to comply with other court-ordered services.

[15] While the trial court found that CYS also met its burden of proof under subsections (a)(1), (5), and (8), "we need only agree with its decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).

parental rights. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). The Orphans' court must examine the status of the bond and determine whether termination of parental rights would destroy an existing, necessary, and beneficial relationship. *Id.* "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child[.]" *Id.*

Due to the severity of the trauma that Children experienced as a result of Mother's abuse and neglect, coupled with Mother's lack of commitment to remedying the conditions that led to Children's removal, Mother had not seen, let alone parented, any of her children for over 15 months at the time of the first termination hearing in July 2019. Thus, any parent-child bond she shared with any of her children prior to these hearings has necessarily diminished.

At the September 30, 2019 termination hearing, Children testified *in camera* in Judge Pavlack's chambers regarding their relationship with Mother. Currently, A. lives with a foster family who gives her love, support, and stability. A. testified unequivocally that she does not want to see or talk to Mother ever again. N.T. Vol. V, at 91. She explained that life is "a thousand times better [now]. . . . I don't get hit. I don't get starved. It's basically a whole new life for us." *Id.* at 94. A's therapist testified that she has seen "significant changes" in A.'s behavior, including decreased aggression and improved academic performance, since A. started living with her foster family. N.T. Vol. IV, at 87-8. The family has also expressed interest in adopting A. and N., who have expressed a desire to live together. *See* N.T. Vol. IV, at 87-107. W. testified that he did not like living with Mother in the past and

explained that Mother "hit [N.] the most." N.T. Vol. V, at 113. When asked whether W. understood what adoption meant, and whether he would like someone else to be his parent, W. answered affirmatively. *Id.* at 115.[16] W.'s therapist testified that W.'s ability to recover from the trauma he endured under Mother's care would be impeded if he returned to her care. N.T. Vol. IV, at 135. He explained that, under Mother's care, it would be difficult for W. to have "a mentally healthy or stable life." *Id.* J. testified that Mother hit him with a belt, her hand, and a T.V. cord, but that he still wanted to live with her. N.T. Vol. V, at 130. J.'s therapist previously testified, however, that J. felt relieved after visitation with Mother ended, and never expressed a desire to return to Mother. N.T. Vol. IV, at 148-52. She stated that returning J. to Mother's care would negatively impact his ability to recover from the trauma he suffered because of her. *Id.* at 156. N. testified that Mother hit her often, did drugs in front of Children, and that living with Mother was "bad." *Id.* at 147. N. explained that she wanted to live with A., and when asked, "How about living with your mother?" N. responded, "Nope." *Id.* at 150.

Furthermore, at the termination hearings, Dr. Beckwith testified at length about Mother's violent tendencies; narcissism; inability to empathize with Children; inability to appreciate her negative impact on Children; "active

_____

[16] Although W. expressed a desire to return to Mother's care after his removal in 2017, his therapist testified that "it should be interpreted with caution[. J]ust because a six-year-old traumatized child says they want to move home with someone who's been identified as an abuser, it doesn't mean, oh well, we'll just listen to the six-year-old child." N.T. Vol. IV, at 124.

child abuser traits;" emotional turbulence; anti-social, "volatile" and "provocative" personality; self-centeredness; refusal to accept her need to change; and tendency to minimize issues with Children. *See* N.T. Vol. V, at 7-25. He testified unequivocally that Mother "poses a direct threat to her children," and that Mother's successful completion of prolonged violent offender treatment—which has not been achieved—was "absolutely vital" for Mother to be able to parent Children "in any capacity." *Id.* at 26, 44; *see also* n.9, *supra.*

In concluding that termination of Mother's parental rights was in the best interests of Children, the trial court observed that:

> Whatever the nature and extent of the bond that each child may have with Mother, the court finds it is not worth preserving. [C]hildren were repeatedly victimized while in Mother's care, both physically and sexually. Each of the children continues to require therapeutic interventions to address the trauma they experienced at Mother's hands and in her care. . . . Severing whatever bond each child has with Mother will not destroy a necessary and beneficial relationship in their lives. Termination of Mother's parental rights may be difficult for J., N., or even W. or A., but it is clear that each of these children needs permanence in a safe, stable home so they can each move forward with their lives and begin to deal with and overcome the abuse, neglect, and trauma that occurred in their past.
>
> They have already waited over two and a half years, and all four children are in need of permanence. The lives of these four children cannot be put on hold any longer. They deserve a safe, secure, stable environment[ and] to be nurtured by the adults in their lives and to be protected from unsafe persons. It appears that Mother has never provided this for them. The time has come to free these children for adoption so they can more effectively work toward achieving the permanency, stability, and security they crave and require. Being freed for adoption means their chances for permanence can be maximized. A prospective pre-

adoptive foster placement has been identified for each child, but even if the planned placement does not take place as hoped, or even if the placement is disrupted, each of these children is best served by being freed for adoption and freed to move forward with his or her life.

Adjudication, 10/1/20, at 23-24 (internal citations omitted).

Based on the foregoing, we conclude that the trial court did not commit an error of law or an abuse of discretion in finding termination of Mother's rights would serve the best interests of Children pursuant to section 2511(b). *In re T.S.M.*, *supra*; *see also In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006) ("The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future."). Therefore, we affirm the court's decrees terminating Mother's parental rights to Children.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/20/2021